```
                              UNITED STATES DISTRICT COURT
                              SOUTHERN DISTRICT OF FLORIDA

                              CASE NO. 07-23016-Civ-LENARD
                              MAGISTRATE JUDGE P.A. WHITE

ANTHONY B. WILSON,            :

     Petitioner,              :
                                     SUPPLEMENTAL REPORT
v.                            :             OF
                                      MAGISTRATE JUDGE
WALTER A. McNEIL,             :

     Respondent.              :
_____
```

I. Introduction

Anthony B. Wilson, a state prisoner confined at South Bay Correctional Institution at South Bay, Florida, has filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. §2254 in this Court, attacking the constitutionality of his convictions entered in Case No. 99-26183 in the Circuit Court of the Eleventh Judicial Circuit of Florida at Miami-Dade County.

This Cause has been re-referred to the undersigned for consideration and report pursuant to 28 U.S.C. §636(b)(1)(B) and Rules 8 and 10 of the Rules Governing Section 2254 Cases in the United States District Courts.

For its consideration of the petition, the Court has the petitioner's response to an order regarding the limitations period with attached exhibits, the respondent's response to an order to show cause with multiple exhibits, the respondent's response to a supplemental order to show cause with exhibits consisting of the state court record on direct appeal and trial transcript, and the petitioner's reply to the supplemental response to order to show cause.

## II. Claim

Wilson raises the sole ground for relief that he was denied a fundamentally fair trial when the state was permitted during cross-examination to ask him whether the state witnesses had lied when testifying or had been conspiring against him.

## III. Procedural History

In brief, the relevant procedural history of this case is as follows.[1] Wilson was charged by Amended Information with the offenses of attempted first degree murder of Antron Pope, burglary with a battery while armed with a knife, aggravated stalking of Antron Pope, and aggravated stalking of Shirley Bertrand.[2] See Amended Information. (Record on Direct Appeal at 10-6)(DE# 29). After trial before a jury, Wilson was found guilty and adjudicated guilty of the attempted first degree murder and burglary offenses. See Verdict; Judgment. (Record on Direct Appeal at 45, 46, 51). The jury found him not guilty of the aggravated stalking offenses, and he was acquitted of those offenses. Id. at 47, 48, 51. The trial court sentenced Wilson to terms of life imprisonment. See Sentence. (Record on Direct Appeal at 54-6). Wilson prosecuted a direct appeal from his convictions, raising *inter alia* the identical claim presented in this federal petition. (DE# 16; Ex. A). The Florida Third District Court of Appeal initially held that the state had improperly cross-examined Wilson, but subsequently affirmed the convictions upon the state's motion for rehearing,

---

[1] The full procedural history of this case need not be reviewed in its entirety in the instant Report in that it has been thoroughly outlined in an earlier Report and Recommendation entered by the undersigned. See DE# 19.

[2] Shirley Bertrand had been Wilson's former girlfriend and the mother of his child. See Trial Transcript at 875-78. At the time of the subject incident, Pope was Shirley's new boyfriend. Id. at 488-89, 520, 879. Bertrand had died before the trial for reasons unrelated to this case.

finding the error harmless. (DE# 16; Ex. C). See Wilson v. State, 880 So.2d 1287 (Fla. 3 DCA 2004). The Florida Supreme Court declined to accept jurisdiction. Wilson v. State, 891 So.2d 554 (Fla. 2004)(table).

After pursuing various forms of pro se state postconviction relief, Wilson came to this Court filing the instant federal habeas corpus petition pursuant to 28 U.S.C. §2254. In his response to the initial order to show cause, the respondent did not challenge the timeliness of the instant petition and also correctly conceded that the sole claim presented in this federal petition was properly exhausted before the state courts. Accordingly, the respondent addressed on the merits the claim raised, arguing that Wilson was not entitled to habeas corpus relief. (DE# 14). A Report was next entered by the undersigned in which the sole claim presented was reviewed and found meritless. See Report of Magistrate Judge. (DE# 19). It was, therefore, recommended that the petition be denied.[3] Id.

Wilson filed objections to the report with attached excerpt of the trial transcript, which consisted of a portion of the prosecutor's closing argument. See Objection to the Magistrate Report. (DE# 22). In his objections, Wilson pointed out an erroneous factual finding made by the Florida appellate court in

---

[3]It was noted in the Report that the respondent had not provided this Court with a copy of the trial transcript. See Report of Magistrate Judge at 4 n.3 (DE# 19). The undersigned stated that while it certainly would have been preferable to have a copy of the trial transcript, disposition of the instant petition need not be delayed to obtain the trial transcript because Wilson's Initial Brief filed in the direct appeal proceeding was part of the record here. The brief contained an extremely thorough recitation of the evidence admitted at trial with record citations and the brief also extensively quoted relevant portions of the transcript. See Initial Brief of Appellant at 1-28. (DE# 16; Ex. A). Further, the pertinent evidence was summarized by the Florida Third District Court of Appeal in its written opinion on direct appeal. See Wilson v. State, 880 So.2d 1287, 1288-1289 (Fla. 3 DCA 2004). It was pointed out that the accuracy of the Initial Brief had never been challenged by Wilson.

its opinion issued in the direct appeal proceeding. See DE# 30. The Florida Third District Court of Appeal held that the prosecutor's actions were harmless error based in part upon the specific finding that "[t]his conspiracy of witnesses against Wilson was not mentioned during the State's closing argument." Wilson, 880 So.2d at 1289. The undersigned's Report had quoted the appellate court's opinion, which included this factual inaccuracy. See Report of Magistrate Judge at 6-9. After independent review of the file and consideration of the objections, the Honorable Joan A. Lenard, United States District Judge, entered an order stating that it was unclear from the Report whether the subject erroneous factual finding was relied upon to support the recommendation that the instant petition be denied. See DE# 23. Consequently, the instant habeas corpus proceeding was re-referred to the undersigned to readdress Petitioner Wilson's claim in light of the subject remarks in the prosecutor's closing argument. Id.

A supplemental order to show cause was then entered, ordering the respondent to file with this Court the entire trial transcript. See DE# 24. The respondent was further ordered to file a supplemental memorandum of fact and law, revisiting the ground raised by the petitioner in this habeas corpus proceeding after the respondent obtained and reviewed the trial transcript in light of Wilson's objections. Id. The respondent has now filed his supplemental response and copy of trial transcript (DE# 25, 29), and the petitioner has filed a reply. (DE# 30).

### IV. Standard of Review

Petitioner filed his petition after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (1996). Post-AEDPA law, therefore, governs this action. Abdul-Kabir v.

4

Quarterman, 550 U.S. 233, 127 S.Ct. 1654, 1664, 167 L.Ed.2d 585 (2007); Penry v. Johnson, 532 U.S. 782, 792, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); Davis v. Jones, 506 F.3d 1325, 1331, n .9 (11 Cir. 2007). It is important to recognize just how limited is this Court's review in a habeas proceeding. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L .No. 104-132, 110 Stat. 1214 (1996), provides that a federal court may not grant the writ unless the state court adjudication on the merits either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

As the United States Supreme Court explained in Williams v. Taylor, 529 U.S. 362, 412-13 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

In deciding whether a state court ruling involved an "unreasonable application" of federal law, this Court does not focus merely upon whether the state court decision was erroneous or incorrect; rather, this Court may issue a writ of habeas corpus only if the state court's application of clearly-established federal law was objectively unreasonable. *See id*. at 409-11. See also Knowles v.

5

Mirzayance, ___ U.S. ___, 129 S.Ct. 1411, 1418 (2009).

The statutory phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta, of [the U.S. Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412, 120 S.Ct. at 1523 (majority opinion by O'Connor, J.). Findings of fact by the state court are presumed correct, and the petitioner bears the burden of rebutting that presumption of correctness by clear and convincing evidence. See 28 U.S.C. §2254(e)(1); Crowe v. Hall, 490 F.3d 840, 844 (11 Cir. 2007), *cert. denied*, ___ U.S. ___, 128 S.Ct. 2053 (2008).

### V. Discussion

Wilson claims that he was denied a fundamentally fair trial when the state was permitted during cross-examination to ask him whether the state witnesses had lied when testifying or had been conspiring against him. As concluded in the earlier Report, albeit on a somewhat different basis, Wilson is not entitled to habeas corpus relief on his claim in that no constitutional violation has been demonstrated.

The record reveals that Wilson was charged by amended information with attempted first degree premeditated murder with a knife of Antron Pope and burglary with a battery while armed with a knife in connection with the stabbing of Antron Pope. At trial, Wilson's theory was self-defense, and he testified in his own behalf that he had gone unarmed to Pope's home to talk, but after an exchange of words, Pope lunged at him with a knife. See Trial Transcript at 898-906. Wilson further testified that he grabbed the knife, he and Pope then wrestled, and the knife broke while in

Pope's hand.[4] Id. at 901. Wilson testified that he sustained cuts from the struggle, requiring medical attention. Id. at 901-02. While it may have been disputed at trial how Pope had sustained his injuries, it was undisputed that Pope suffered multiple stab wounds, several on the back of his head, his arm, shoulder, and abdomen. Id. at 295-97, 301, 521-30, 535, 536-37, 753-60, 764-78. Further, it was beyond dispute that several of the twenty or so stab wounds were serious enough to have caused death if they had not been promptly treated and all of them needed to be sutured. Id. at 753-60, 764-78.

Wilson was called as a witness in his own behalf and he denied during cross-examination that he had ever harassed or threatened his ex-girlfriend Shirley Bertrand and victim Pope and he denied that he had wanted to reunite with Bertrand. Id. at 919-20. The claim of prosecutorial misconduct is based on the following exchanges during the prosecutor's further cross-examination of Wilson:

> Q   Now you have had the benefit of sitting throughout this entire trial.
>
> MR. GREY:       Objection, Judge.
>
> THE COURT:      Overruled.
>
> Q   Correct.
>
> A   Yes.
>
> Q   We picked this jury. We've had questions from that witness stand, from other witnesses, is that correct?
> A   Yes.
>
> Q   You sat there the whole time and listened to what

---

[4]For a more detailed recitation of the facts of the case, see Initial Brief of Appellant at 1-28. (DE# 16; Ex. A).

7

>           everybody said?
>
> A    Yes.
>
> Q    You heard what Kia[5] said. That you were harassing Shirley, you were coming by constantly and wouldn't go away?
>
> A    I heard everything.
>
> Q    You heard what Dakeidra[6] said, you were coming to the house and you were harassing Shirley and wanted Shirley back. You heard that?
>
> A    Yes.
>
> Q    You heard [victim] Antron's testimony, yes?
>
> A    Yes.
>
> Q    And you heard today, Shirley's own mother come in here and testify about how you were threatening her daughter and how you were threatening Antron. **But they're all lying?**
>
>           MR. GREY: Objection. He has to be here during trial.
>
>           THE COURT: No speaking objection.

---

[5]Kia Samuels had been a friend of Shirley's, and she had witnessed arguments between Wilson and Shirley, some of them regarding Pope. See Trial Transcript at 246-304. Samuels testified extensively about the relationship between Wilson and Shirley and also about Shirley and Pope's relationship. Id. She also testified with regard to an incident that took place a few days before the subject stabbing where Shirley had sustained physical injuries at the hand of Wilson. Id. at 273.

[6]Dakeidra Faniel testified that Shirley was the sister of her children's father, that she and Shirley had been friends for approximately seven years, and that she and Wilson attended high school together and had lived in the same neighborhood for approximately ten years at the time of the subject incident. See Trial Transcript at 329-32, 337. As did Samuels, she too extensively testified about Shirley's tumultuous relationship with Wilson and the good relationship Shirley shared with Pope. Id. at 330-56. Faniel testified that it was Shirley who had ended the relationship with Wilson and that it was Wilson who had wanted to reconcile with Shirley. Id. at 338-40. She testified that Wilson was jealous of Shirley's relationship with Pope and further testified regarding the incident that took place a few days before the subject stabbing where Shirley arrived at Faniel's home crying and upset and with a swollen face, claiming that Wilson had punched her in the face when she told him that she did not want to reconcile. Id. at 333, 340, 344-50. Faniel testified that a few minutes after Shirley arrived at her house on that earlier incident, Wilson appeared, looking for Shirley. Id. at 350-52.

>           Objection overruled. Talk about it
>           sidebar. Continue.
>
>           MR. GREY: May I have a sidebar? It is
>           improper to ask one witness-
>
>           THE COURT: Stop, stop. That is a
>           speaking objection.
>
> Q  **Do you believe that all these witnesses are conspiring against you?**
>
> A  Well-
>
> Q  **That's what you think, this is a big conspiracy? You've got the officer. You've got Shirley's mother. You've got Shirley's friend. You got Antron, the ex-boyfriend. You got everybody coming in here saying the same thing, but it is because they are conspiring against you?**
>
>           MR. GREY: Objection. That is
>           argumentative.
>
>           THE COURT: Overruled.
>
> Q  **Yes or no, are they conspiring against you?**
>
> A  **Yes**.

(emphasis added)(Trial Transcript at 921-23). During his closing arguments, the prosecutor reminded the jury of the above-quoted questions and answers, stating:

> You have heard from a lot of witnesses. [Wilson] yesterday tells you that it's a **conspiracy**.
>
> Now, we've heard a lot of preposterous things, but that is the ultimate. To say that Shirley's mother and Antron Pope, his family, his own friend, Dakeidra and Kia all came in here to **conspire against him**, because of what?
>
> Because it is not true. **There is no conspiracy**. The only thing we're trying to do is achieve the truth, get to justice, ladies and gentlemen.

(emphasis added). Id. at 981.

To prevail on a claim of prosecutorial misconduct in a federal

9

habeas corpus proceeding, a petitioner must demonstrate that the prosecutor's conduct violated a specific constitutional right or infected the trial with such unfairness as to make the resulting conviction a denial of due process. Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). See also Greer v. Miller, 483 U.S. 756, 765 (1987)(quoting Donnelly v. DeChristoforo, 416 U.S. at 643). It is not enough to show that the prosecutor's conduct or remarks were undesirable or even universally condemned. Darden v. Wainwright, 477 U.S. 168, 181 (1986). In other words, the complained-of conduct must be so egregious as to render the entire trial fundamentally unfair. Donnelly v. DeChristoforo, 416 U.S. at 642-45. See also Greer v. Miller, 483 U.S. 756, 765 (1987)("To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." (internal quotations and citations omitted)); Davis v. Zant, 36 F.3d 1538, 1545 (11 Cir. 1994)(citing Donnelly v. DeChristoforo, 416 U.S. at 645). In assessing whether the fundamental fairness of the trial has been compromised, the totality of the circumstances are to be considered in the context of the entire trial, Hance v. Zant, 696 F.2d 940 (11 Cir.), cert. denied, 463 U.S. 1210 (1983); and "[s]uch a determination depends on whether there is a reasonable probability that, in the absence of the improper remarks, the outcome of the trial would have been different." Williams v. Weldon, 826 F.2d 1018, 1023 (11 Cir.), cert. denied, 485 U.S. 964 (1988).

More specifically to the issue here, as a general proposition, both the federal and state courts have held that it is improper cross-examination to ask a witness if another witness (who had previously testified) "was lying" or for a witness to offer his personal view on the credibility of a fellow witness in that it constitutes an invasion of the jury's exclusive province as the

sole arbiter of the credibility of witnesses. See e.g., United States v. Sullivan, 85 F.3d 743, 750 (1 Cir. 1996)("was-the-witnesslying" questions constitute misconduct because it invades the jury's task to resolve credibility questions); United States v. Gaines, 170 F.3d 72, 81 (1st Cir. 1999)(improper for attorney to ask a witness whether another witness lied on the stand); United States v. Boyd, 54 F.3d 868, 871 (D.C.Cir. 1995)(finding that the prosecutor acted improperly in asking the defendant why officers were "making this up" and putting their careers on the line "to get" him); Whitfield v. State, 549 So.2d 1202 (Fla. 3 DCA 1989), *citing*, Boatwright v. State, 452 So.2d 666, 668 (Fla. 4 DCA 1984)(holding that it is an invasion of jury's exclusive province for one witness to offer his personal view on credibility of a fellow witness). But see United States v. Garcia-Gracia, 324 Fed.Appx. 286, 295-96 (5 Cir. 2009)(holding that where defendant had testified during direct examination that testimony of government witnesses was inaccurate, prosecutor's line of questioning of defendant during cross-examination whether defendant thought the agents were either "lying or mistaken" was not improper in that it was intended as a response to defendant's effort to expose the government witnesses as untruthful or at least inaccurate).

While even a single improper question can provide a basis for habeas relief, it can do so only under unusual circumstances. "[A] prosecutor's unprofessional cross-examination ... cannot give rise to a constitutional claim unless the prosecutor's acts constitute 'egregious misconduct.'" Miranda v. Bennett, 322 F.3d 171, 180 (2 Cir. 2003)(*quoting* Donnelly v. DeChristoforo, 416 U.S. at 647-48). The courts have also held that a petitioner is not deprived of due process where a prosecutor asserts that a defense witness lied, including the defendant, where such statements were reasonable

inferences drawn from the physical evidence and witness testimony. See <u>United States ex. rel. Williams v. Washington</u>, 913 F.Supp. 1156, 1163-1164 (N.D.Ill. 1995). <u>See also</u> <u>White v. Kapture</u> 2001 WL 902500, *11 (E.D.Mich. 2001)(holding that a state prosecutor's references to a defendant as a liar and to the defendant's testimony as lies does not violate a habeas petitioner's right to a fair trial where the evidence of guilt is overwhelming, the remarks are isolated, and the remarks do not mislead the jury).

It is apparent from review of the record as a whole that the questions and anticipated answers were intended as a response to Wilson's effort to expose the state witnesses as untruthful or at least inaccurate. The now-challenged questions were essentially a fair line of inquiry conducted in light of the testimony provided by Wilson on direct examination and the defense theory presented, which has been held proper. <u>See e.g.</u>, <u>United States v. Garcia-Gracia</u>, 324 Fed.Appx. at 295-96. Even if this Court were to assume, without deciding, that the prosecutor's line of questions was improper, the error was not so prejudicial as to affect the fundamental fairness of the trial. When viewing the now-challenged questions in the context of the entire trial, the cumulative effect of the questions was relatively minimal. The subject line of inquiry was a brief part of the overall cross-examination.[7] <u>See</u> Trial Transcript at 921-23. The prosecutor asked "lying" and/or "conspiracy" questions only four times, and in each instance the state had already established that Wilson's account of events conflicted with the testimony of the other state witnesses. Further, the evidence of Wilson's guilt was overwhelming. The subject questions, therefore, did not have the effect of vitiating

---

[7]The entire cross-examination spanned twenty pages of the trial transcript and the subject line of questioning consisted of only three of those pages. <u>See</u> Trial Transcript at 907-24, 927-30.

12

the entire eight-day trial and did not change the physical evidence of multiple stab wounds suffered by Pope.[8] When taken in the light most favorable to the state, the competent evidence admitted at trial upon which the jury's verdict was based was more than ample to have permitted a rational trier of fact to find that Wilson committed the crimes for which he was convicted. See Jackson v. Virginia, 443 U.S. 307 (1979).

It is noted that the subject questions followed other questions concerning the harassing and threatening of Pope and his girlfriend Shirley. The questions were apparently intended to mainly pertain to the charges of stalking, for which Wilson was acquitted, although the questions and subsequent remarks in closing certainly also could have also been interpreted by the jury to support the premeditation element of the attempted first degree murder offense. It is important to remember that the core of the defense presented at trial was that it was Pope who had been jealous of Shirley's ongoing relationship with Wilson and that Pope's version of the events, resulting in the stabbing, was not truthful and should not be believed.[9] Part of this defense was that Wilson had gone to Pope's

---

[8] For example, Pope testified at trial that he was stabbed by Wilson and as a result of the stab wounds, he lost consciousness, he required treatment at a hospital, and he remained at the hospital for five days. See Trial Transcript at 520-25, 531-32. Pope further testified that he needed stitches on the side of his face, near his eye, in the back of his head, on his arm, on his stomach, and his ear. Id. at 526-27. He testified that he also sustained cuts and bruises to his knees and hands from the fall which resulted from the blow and stabbing he took to his stomach. Id. at 527-28.

[9] Trial counsel's following remarks during closing argument are illustrative of the defense presented:

> [W]hen you take this case and you break it down to its simplest, barest point, you break it down to its essence, it comes down to a fight between two guys involving one knife. Once you realize it is really that simple, that's all the case really comes down to, and then everything from that point on becomes a search. It simply becomes a search for evidence and testimony which tend to prove that one person's version is true over another version.

13

home merely to talk, but Pope came at him with a knife, requiring him to take the actions he did in self-defense.[10] Wilson's testimony

---

> Antron Pope says, "Anthony Wilson jumped out of the bushes and attacked me."
>
> Anthony Wilson says, "I went to talk to the guy, and he didn't like what I had to say, and pulled a knife on me."
>
>     (Trial Transcript at 953-54).
>
> He is not mad. Not Antron Pope. After all, he is not a jealous guy. Right? He checks his cell phone after Shirley uses it to see who she had been calling. That is out of curiosity, not because he is jealous. Not even, ladies and gentlemen, when his girlfriend call him at 4 in the morning to tell him that she has been over at another man's house, and that other man has hit her, did our candidate for the Nobel Peace Prize gets [sic] upset.
>
> That's what he wants you to believe. That's what you have to believe in order to believe Antron Pope.
>
> Does that sound logical to you?
>
>                  *         *         *
>
> What man would not be upset learning that his girlfriend was at another man's house at 4 in the morning, doing god knows what, and that that man hit her?
>
> No man I ever met. No man except Antron Pope.
>
> Of course, he was upset. Of course, he was furious to hear about those things. And when Anthony shows up at his house to tell him what he already knows, deep down inside, to be true, it was too much, and he snapped.
>
> The lies in his testimony, ladies and gentlemen, are too obvious to overlook. And if he is lying about some things, you have to ask yourselves, what else is he lying to you about?
>
>     (Trial Transcript at 959-61).

[10]Trial counsel stated during the conclusion of his closing argument:

> Now, the most serious charges, the attempted first-degree murder and burglary with a battery, the Judge is going to read you a self-defense instruction, some law about self-defense. I ask you to follow that very closely, ladies and gentlemen. Pay very close attention, because you will find that that instruction is going to mirror what happened in this case, and is going to tell you why, under the law, Anthony Wilson is not guilty.

(Trial Transcript at 968).

conflicted with testimony of the other state witnesses, such as, victim Pope and Shirley's friends and relatives. Wilson challenged the credibility of the two victims, especially Pope as to the events that led to the attempted first degree murder charge. Thus, it is clear that while the state questioned Wilson's credibility and defense presented, the defense also vigorously challenged the veracity and credibility of the state witnesses, and implicitly at the minimum, called Pope a liar. Although an improper remark by defense counsel does not necessarily justify one in response by the state, it may provide the necessary context in which we review the prosecution's comments.

Contrary to the state appellate court findings, review of the closing argument in its entirety reveals that the prosecutor did in fact mention Wilson's theory as a "conspiracy" of the state witnesses to convict him, again implying either that Wilson was a "liar" and/or Wilson was accusing state witnesses of "lying." See Trial Transcript at 981. The courts have held that calling the defendant a "liar," though perhaps undesirable, does not rise to the level of a constitutional violation particularly where, as here, the statements would have been perceived only as commentary on the implausibility of the defendant's story. See United States v. Hernandez-Muniz, 170 F.3d 1007, 1012 (10 Cir. 1999)(holding that referring to defendant's testimony as a lie does not constitute per se prosecutorial misconduct especially where statements would have been perceived only as commentary on the implausibility of the defendant's story)(internal quotation and citation omitted).[11] The

---

[11] See also Bland v. Sermons, 459 F.3d 999, 1025 (10 Cir. 2006)(while labeling a defendant as a liar may be improper in certain situations, "it is permissible for the prosecution to comment on the veracity of a defendant's story"); United States v. Catalfo, 64 F.3d 1070, 1080 (7 Cir. 1995)("Where the character and credibility of the defendant are at issue and the evidence allows the inference that the defendant has been less than truthful, the prosecutor does not err in closing argument by referring to the defendant as a liar."); United

prosecutor did not offer a personal assurance or refer to evidence outside the record, but simply argued that the state's version of the conflicting evidence was correct, which has been held proper. See Duckett v. Godinez, 67 F.3d 734, 742 (9 Cir. 1995)("The prosecutor's assertions regarding the relative believability of the state and defense witnesses were not representations of his personal opinion, but inferences drawn from the evidence.")

In the context of this case, the prosecutor's questions and comments were not so improper as to render the entire trial fundamentally unfair for another reason. Any lingering impact the questioning on cross-examination may have had with regard to the crimes for which Wilson was convicted and any possible impact the gratuitous remarks made during closing argument may have had were effectively dispelled by the trial court's repeated instructions to the jury that the jurors were "the final arbiters" with regard to the facts of the case and it was up to them to resolve conflicts in the evidence and determine the reliability of evidence and witness testimony.[12] See Trial Transcript at 158, 936, 1000. Further, the

---

States v. Jacoby, 955 F.2d 1527, 1540-41 (11 Cir. 1992)(holding that prosecutor's comments in criminal prosecution of bank officials, remarking that, given glaring differences in testimony between prosecution and defense witnesses, "someone is committing perjury," and that testimony of two witnesses regarding fact in issue was "absolute lie," although colorful and perhaps flamboyant, were neither improper nor unduly prejudicial and did not require reversal; in each instance, prosecutor asked jury to consider and draw its conclusions from evidence in case, and jurors were instructed that argument by counsel was not evidence); Bradford v. Whitley, 953 F.2d 1008, 1013 (5 Cir. 1992)(prosecutor in closing argument calling defendant a liar fell short of a due process violation in that the comments were neither persistent nor pronounced when considered within the context of the entire closing argument).

[12]Credibility was certainly a key issue for the jury here and such credibility determinations are the exclusive province of the jury. See Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. at 2788-89 (1979)(explaining that it is the duty of the trier of fact "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). Any discrepancies between the victim's testimony and testimony of other state witnesses, on the one hand, and Wilson's testimony on the other concerning the events that occurred before the subject stabbing incident and the incident itself were properly resolved by the jury as the trier of fact, as the jury was

16

court instructed the jury that what the lawyers said during opening statement and closing argument was not evidence in the case and should not be considered as such and that the case should be decided solely upon the witness testimony and evidence admitted at trial. Id. at 160, 232, 936, 1003. It is generally presumed that jurors follow their instructions. See, e.g., Richardson v. Marsh, 481 U.S. 200, 211 (1987).

Thus, under the totality of the circumstances, including the strength of the evidence of Wilson's guilt, it is apparent that the prosecutor's questions were at worst no more than harmless error. See Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), quoting, Kotteakos v. United States, 328 U.S. 750, 776 (1946)(a petitioner is entitled to federal habeas corpus relief only if the constitutional error from his trial had substantial and injurious effect or influence in determining the jury's verdict). See also Knowles v. State, 632 So.2d 62, 65-66 (Fla. 1993), *citing*, Boatwright v. State, 452 So.2d 666 (Fla. 4th DCA 1984).

The now-challenged inquiry on cross-examination, even when coupled with the brief undesirable remarks made during closing argument,[13] did not affect the outcome of the trial. Wilson was, therefore, not denied a fundamentally fair trial, entitling him to habeas corpus relief. See Haynes v. Runnels, 2008 WL 2775709, *7 (E.D.Cal. 2008)(habeas corpus court holding that questions on cross-examination to state defendant asking him whether the thought that state witnesses had "lied" or had "inaccurately or falsely" accused

---

accurately instructed.

[13] The prosecutor's reference to a "conspiracy" was a mere brief comment in three sentences of the closing argument. See Trial Transcript at 981. The prosecutor's closing argument was extensive, totaling thirty-pages of the trial transcript. Id. 936-53, 969-82.

him of the crimes did not "so infect the trial with unfairness" as to result in the denial of a fair trial). Accordingly, despite the state appellate court's certain incorrect factual findings, the rejection on direct appeal of the identical claim presented in this federal petition, is not in conflict with clearly established federal law or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Relief must therefore be denied pursuant to 28 U.S.C. §2254(d). Williams v. Taylor, 529 U.S. 362 (2000).[14]

## VI. Conclusion

Based upon the foregoing, it is recommended that this petition for habeas corpus relief be denied.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Signed this 17th day of February, 2010.

_____
UNITED STATES MAGISTRATE JUDGE

---

[14] In the event that the state appellate court during the direct appeal did not properly address on the merits the exact constitutional claim raised in this federal petition, the standard established by the AEDPA would not be applicable, requiring a de novo review. See Cone v. Bell, ___ U.S. ___, 129 S.Ct. 1769, 1784 (2009), citing, Rompilla v. Beard, 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005)(de novo review where state courts did not reach prejudice prong under Strickland v. Washington, 466 U.S. 668 (1984)); Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)(same). See also Romine v. Head, 253 F.3d 1349, 1365 (11 Cir. 2001), cert. denied, 535 U.S. 1011 (2002). In the abundance of caution, this Court conducted such heightened review, and Wilson is nonetheless not entitled to federal habeas corpus relief on his claim in that the ground is meritless for the reasons expressed herein.

cc:   Anthony B. Wilson, Pro Se
      DC# M32119
      South Bay Correctional Facility
      600 U.S. Highway 27 South
      South Bay, FL 33493

      Jill Diane Kramer, AAG
      Department of Legal Affairs
      444 Brickell Avenue
      Suite 650
      Miami, FL 33131